**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIM. NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KENYATTA CORBETT,** | : | **(Electronically Filed)** |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

**I.   AN ABOVE-GUIDELINES RANGE SENTENCE OF LIFE IMPRISONMNT IS WARRANTED AND SUBSTANTIVELY REASONABLE .**

Corbett was charged in the Second and Third Superseding Indictments, returned by a grand jury in Harrisburg on December 20, 2018 and January 29, 2020 respectively, with multiple violations of law relating to the murders of a DEA cooperator, Wendy Chaney, as well as Phillip Jackson and Brandon Cole who, unfortunately, were present when Chaney was murdered and were themselves killed because of their status as potential federal witnesses to Chaney's murder and Hobbs Act robbery. Those charges included, among others, Hobbs Act robbery (18 U.S.C. § 1951(a)), conspiracy to commit Hobbs Act robbery (18 U.S.C. § 1951(a)), Interstate Travel to Commit Murder for Hire (18 U.S.C. § 1958), three counts of killing a federal witness to prevent communication with

federal law enforcement (18 U.S.C. § 1512(a)(1)(c), conspiracy to do the same (18 U.S.C. § 1512(k)), three counts of using a firearm in furtherance of a crime of violence (18 U.S.C. §§ 924(c) and (j)), and unlawfully distributing heroin (21 U.S.C. § 841(a)(1)).

Corbett would not admit to his involvement in the murder for hire part of the crimes committed on June 25, 2016. Consequently, the United States constructed a plea agreement that allowed Corbett to plead guilty to Count One of the Third Superseding Indictment, i.e., conspiracy to commit Hobbs Act robbery, and to a Superseding Information charging Corbett with being an accomplice in the use of a firearm to commit the completed crime of Hobbs Act robbery. While this plea agreement did not represent, in the United States' view, Corbett's total complicity in the crimes he was indicted for, this plea agreement was specifically constructed and required by the United States so as to allow the United States to seek a life sentence pursuant to the 924(c) conviction through relevant conduct and through the mechanisms of an upward departure under appropriate sections under  U.S.S.G. Section 5K2.0 (Grounds for Departure) or a variance under 18 U.S.C. § 3553(a), or both.

Corbett is a Category VI offender, with convictions for firearms and drug offenses beginning when he was a juvenile and continuing after the June 25, 2016 murders. Doc. 935, pp. 13-16; p. 16, para. 44. The cross-reference for murder found at § 2A1.1(a) was used due to the murders which, after adjustments upward then down for acceptance of responsibility, resulted in a total offense level 42. Doc. 935, para. 23. But for the statutory maximum of 20 years for Hobbs Act robbery, the advisory guidelines range for that crime would be 360-life. Doc. 935, paragraphs 23, 25, 30, 31 and 69.

The guidelines imprisonment range for the 924(c) conviction is the minimum term of imprisonment required by statute, which in this case is 10 years. Doc. 935, para. 70. However, while the court's sentencing options on the Hobbs Act robbery are limited due to the statutory maximum term of imprisonment authorized by law, i.e., 20 years, that is not the case for the 924(c) conviction. The advisory guidelines might be 10 years, but the court is free to sentence Corbett up to life imprisonment.

The defendant asks the court to impose a sentence within the guidelines range of 292 – 360 month's imprisonment. Doc. 1755, p. 7. He justifies his request by claiming, among other things, that he: 1) has

admitted to his involvement in the Hobbs Act robbery and consistently denied any prior knowledge of or participation in the carrying out of any of the June 25, 2016 murders; 2) has accepted responsibility and is truly remorseful; 3) he was the least culpable of all involved in this murderous episode; and 4) to give him hope that he will one day be released from prison.

To the contrary, the United States respectfully requests the court vary from the guidelines and impose the statutorily authorized maximum sentence of life imprisonment for the 18 U.S.C. § 924(c) conviction, and the statutorily authorized maximum sentence of 20 years' imprisonment for the Hobbs Act robbery conspiracy. Such a sentence would be sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), which include:

(2) the need for the sentence imposed –

(a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(b) to afford adequate deterrence to criminal conduct;

(c) to protect the public from further crimes of the defendant; and

(d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Additionally, there are factors that warrant a departure and a sentence outside of the advisory guidelines range based upon USSG §§ 5K2.1 Death, 5K2.4 Unlawful Restraint, and 5K2.21 Dismissed and Uncharged Conduct, to address the triple murders and the defendant's participation in same.

It is respectfully suggested that the discussion that follows supports the United States position that a life sentence is sufficient but not greater than necessary and fully justified in this case.

### A. The Defendant's claim that he was unaware that Wendy Chaney was targeted for killing or that anyone else would be murdered is palpably false.

The defendant maintains that he had no knowledge beforehand that anyone would be killed or that anyone was targeted for killing. In support of that position Corbett notes that he has consistently denied knowledge of, planning, or participation in the actual murder of Chaney, Jackson, and Cole. Doc. 1755, p. 2; pp. 10-11.  Corbett also points to the fact that he only admitted to the Hobbs Act robbery conspiracy and to being an accomplice in the discharge of a firearm during that crime and

was never asked at his change of plea proceeding and did not admit to knowing that the murder of Wendy Chaney was the point of the "mission". Doc. 1755, p. 9.

It is agreed that Corbett has consistently denied knowing that the mission was to kill a DEA cooperator. But consistently minimizing his involvement does not have the effect of validating the false version put forward by Corbett about his knowledge and involvement. Corbett's own sentencing memorandum provides a factual assertion that is completely at odds with the narrative Corbett has spun for investigators from the beginning. And the information provided by some of Corbett's co-defendants in the form of sworn testimony at two separate trials that was subject to cross-examination is clearly irreconcilable with Corbett's claims of lack of knowledge of the murder for hire.

When Corbett was arrested and interviewed he initially denied *any* involvement in either the murders *or* the robbery. It was only after agents questioned Corbett's answers and denials that Corbett, after asking for a break in the interview, acknowledged his participation in the June 25, 2016 events, but only in what he said he believed would be a robbery. Corbett denied knowledge of or participation in the murders. And in that

interview, and going forward, Corbett steadfastly maintained that the idea to commit the robbery of Phillip Jackson was his and began with information given to him by Michael Buck.  He initially claimed he shared that information with Jerrell Adgebesan and participants from Baltimore who ultimately took over the nascent plans for robbery. In that post-arrest interview Corbett described Buck as the "ringleader" of the robbery because Buck was the original source of the information about what might be at Phil Jackson's farm.

Yet, in subsequent interviews, this story evolved. Corbett then settled on a version of events where he claimed to be down on his luck as a drug dealer, needed money, and that he was the sole initiating force behind the robbery. Furthermore, Corbett maintained that the only reason he met up with Adgebesan in Baltimore that day was to get a handgun since Corbett claimed he did not have one.  But even those versions of events have dramatically changed with the representations made in his most recent filing.

In his sentencing memorandum, after acknowledging he played a "meaningful role", Doc. 1755, Corbett then states the following:

*He (Corbett) served as a link between the Hagerstown drug dealers he knew who organized the robbery (including Kevin Coles and Devin*

*Dickerson)* and Jerell Adgebesan, who sold drugs with Mr. Corbett in Hagerstown and, unlike Mr. Corbett, had connections in Baltimore to persons willing to use violence to commit a robbery.

Doc. 1755, p. 3 (emphasis added).

Corbett has *never* acknowledged knowing Kevin Coles or Devin Dickerson. Corbett has *never* claimed that he knew that Coles, Dickerson, and other drug dealers in Hagerstown organized the robbery.  In fact, Corbett has steadfastly and without revision maintained that he alone came up with the idea to rob Phillip Jackson after speaking with Michael Buck, a heroin addict and customer of Corbett's, who was also getting heroin from Jackson. This is a stunning admission on the eve of sentencing since, at the very least, it shows Corbett lied to investigators about the scope of those involved in this episode, to now include unidentified "Hagerstown drug traffickers" who "organized" the robbery and that persons willing to use violence were specifically brought in.

Additionally, after his initial interview, Corbett has maintained that the only reason he approached Adgebesan was because Corbett did not have a handgun and thought Adgebesan could get one in Baltimore. Yet now, on the eve of sentencing, Corbett claims he served as "the link" between those planning the robbery and Adgebesan, who had

8

"connections in Baltimore to persons willing to use violence to commit a robbery". Doc. 1755, p. 3. Corbett is thus changing his story to acknowledge Adgebesan was used because he knew people who were capable of engaging in violence. The United States suggests that this reconstruction of the facts is designed by Corbett to make his current version of events believable, since the version he had been telling was unbelievable as discussed below.

First, under Corbett's pre-June 21, 2023 version, meaning prior to the version in his sentencing memorandum filed that day, Corbett said he went with Buck to the Jackson property the morning of June 25, 2016 to do surveillance in advance of what was to be the theft of drug proceeds and drugs. Phil Jackson, Devin DeStefano, and Zach Bowie were in the barn when Buck went in, so Corbett and Buck left. That much of it was essentially verified by Buck.

However, during the day, Buck learned that Jackson and the others left the property. Jackson and the others left to take Bowie to the airport. Knowing that there was no one at the Jackson property, Corbett and Buck had hours to go to the vacant Jackson property and steal whatever they could without fear of encountering anyone. And Buck testified that

Corbett wanted him to monitor Jackson's whereabouts so they could go back to the property if no one was there to steal drugs and/or drug proceeds. *U.S. v. Coles*, N.T. April 14, 2022, p. 34, lines 11-18; *U.S. v. White*, June 5, 2023, p. 53, lines 1-15. Given that, it is as if Corbett was waiting until Jackson returned, rather than taking advantage of his absence from the property.

Furthermore, Corbett claimed he met Adgebesan in Baltimore ostensibly to just get a gun since Corbett did not have one. This is a difficult premise to accept, given that Corbett was a significant heroin trafficker in Hagerstown who undoubtedly could have obtained a handgun with relative ease without involving Adgebesan and having to travel to Baltimore. Then while in Baltimore, according to Corbett, he never does secure a handgun, and essentially winds up having his own robbery scheme commandeered by a number of armed BGF members who tag along to conduct the robbery at the Jackson property where now there will most certainly be people present. And, coincidentally, Wendy Chaney, who Adgebesan and Johnson admitted they were hired to kill, wound up at the Jackson property and was there when the caravan of killers arrived. Corbett was told repeatedly that the odds of this

10

remarkable confluence of events occurring was astronomical, and the version made no sense. It was also explained to Corbett that it was difficult to imagine he would be able to persuade a group of BGF members from Baltimore to travel into rural Pennsylvania where they had never before ventured to steal drugs/drug proceeds/firearms, all on the word of an unknown heroin addict, let alone be able to carry out their separate, undisclosed conspiracy to kill a DEA cooperator without knowing if she would even be at the Jackson property, all without Corbett knowing about it.

But Corbett stuck with it. Now, under his latest version, Corbett seems to be angling for some wiggle room to validate his dubious claim that, unbeknownst to him, others may have intended for Chaney to be killed, since he now claims other Hagerstown drug dealers, including Coles and Dickerson, organized the robbery and recruited violent people from Baltimore to carry it out. The only thing consistent about Corbett's version is that it is and has been consistently unbelievable.

Additionally, the testimony of Christopher Johnson and Michael Buck at two separate trials for two co-defendants puts the lie to Corbett's claims. On April 14, 2022 Buck testified at the trial of co-defendant Kevin

Coles. Buck's testimony made it crystal clear that Corbett was involved

in the murder for hire of Wendy Chaney. Buck testified that Corbett was

aware that Chaney was cooperating with law enforcement and had to go:

> **A**.  And then Corbett  and I had had a couple of conversations about her being a rat and he said that she was telling on his guys. He referred to her as a fat bitch with a missing tooth.
>
> **Q**.  Who referred to her that way?
>
> **A**.  Corbett.

p. 24, lines 6-11

> **A**.  So I had brought up Tyler and then Tyler's mom, and he (Corbett) was like, "Okay, she's no good."
>
> **Q**.  Who says that?
>
> **A**.  Corbett said --
>
> **Q**.  Says what?
>
> **A**.  Said that Wendy was no good, said he didn't want to be there like when Tyler came over to get high. So he left, Tyler came over, we got high.
>
> **Q**.  What did it mean to be she was no good?
>
> **A**.  She was no good, like don't fuck with her.
>
> **Q**.  Because?
>
> **A**.  Because she's an informant. She's telling.

p.26, lines 14-25.


Buck testified how Corbett told him on the day off the murders that

Wendy had to go:

> **A**.  "Yeah, that fat bitch, she's gotta fucking go."
>
> **Q**.  I can't hear what you're saying. What did you say?

12

**A.**    Corbett had mentioned to me that Wendy had to go. Like she was cooperating and telling on his boys Drop and K and a bunch of shit was getting ready to go down.

**Q.**    So you remember him saying Wendy had to go?

**A.**    Yes.

**Q.**    She was cooperating against a bunch of people?

**A.**    Yes.

**Q.**    And two of them specifically you recall being Drop and K?

**A.**    Yes.

**Q.**    She had to go?

**A.**    Yes.

**Q.**    Where does this conversation take place?

**A.**    In his car.

p. 28, lines 10-25

**A.**    "Yeah, she's telling, she's telling on Drop and K, she's getting ready to fuck a lot of shit up, a lot of shit's getting ready to go down. Like she's gotta go."

**Q.**    What did you interpret to that mean when he said she's gotta go?

**A.**    Someone's got to kill her.

p. 31, lines 16-22.

Buck testified that later in the evening when Corbett arrived at Buck's house with the group from Baltimore and co-defendant Torey White, the discussion was about the robbery and whether or not Chaney would be at the Jackson property:

**A.**    Corbett and I were talking and he was asking me questions about who was up there, what was up there, where things were. I said there's usually people in the barn. His crack dealer is probably going to be up there. And he's like, "Yeah, she's got to go," and he looked at the group of guys and they were like -- well, somebody had

13

asked like how they would know like she was going to be there, who all was going to be there, and that's when Drop standing right in front of me says, "That bitch is gonna be up there." So they knew that Wendy was going to be up there.

p. 40, lines 9-18

Finally, Buck testified that Corbett threatened him and put a handgun in Buck's mouth once he learned Buck had been contacted by the Pennsylvania State Police. Pp. 46-47. Apparently Corbett's opportunity to secure a handgun greatly improved since June 25, 2016.

Buck also testified at the trial of co-defendant Torey White in June of this year, where Buck's testimony was essentially the same as in the *Coles* trial. Buck said that at the staging meeting in Buck's house the night of June 25, 2023, Corbett told the assembled killers from Baltimore that Wendy would be at the farm and "she's gotta go." *U.S. v. White*, May 5, 2023, p. 63, lines 6-12.

Christopher Johnson, the hired killer, likewise testified at both the *Coles* and *White* trials to being recruited by Adgebesan, who was with Corbett, to do the robbery and the contract killing:

> **Q.**   Before we go any further, you said there was an individual with Jerell Adgebesan in his vehicle.
> **A.**   Yes.
> **Q.**   You have never seen before?
> **A.**   No.

14

**Q.**   Didn't know this individual?

**A.**   Yes.

**Q.**   Did you meet him that day in Baltimore on the porch?

**A.**   Yes.

**Q.**   Was he part of the discussions that were going on about this being a killing of an individual and a robbery?

**A.**   Yes. From my understanding the scene he had the know how or he was -- I knew Jerell wasn't from Hagerstown, so I'm assuming this guy was and he knew the lay of the land better than Jerell did.

**Q.**   But my question was was he part of these discussions.

**A.**   Yes. Yes.

**Q.**   There's no doubt in your mind that on that day, before anybody leaves Baltimore, that that individual with Adgebesan knows that this is going to be a killing and a robbery?

**A.**   Yes.

*U.S. v. Coles*, N.T. p. 18, lines 1-21

Johnson also testified that when they were in Buck's kitchen before traveling up to Jackson's farm, the following was discussed:

**A.**   At the moment we learned that it was, the person we was supposed to kill was a female victim. Well, she was a female victim and she was cooperating with authorities and they wanted her killed, and anything we found there was for the taking.

*U.S. v. Coles*, N.T. p. 21, lines 6-10.

This conversation was essentially what was discussed in Baltimore by

Adgebesan in the presence of Corbett:

**A.**   Yes. He was talking to the guys on the porch about --well, when I walked over it was more so, the logistic of the conversation was about, you know, going up to Hagerstown, robbing and killing somebody for money.

**Q.**   That was the gist of the conversation?

15

**A.**    Yes.

**Q.**    Who was Jerell Adgebesan talking to about going to Hagerstown to kill somebody and get some money?

**A.**    Just generally everyone on the porch, you know, who wanted to be involved. It was an opportunity, you know, they needed someone killed up there. So, you know, who wanted to go or who wanted the money and it intriguing me because I was having financial problems. So, you know, I joined in the conversation and.

*U.S. v. Coles*, N.T. p. 14, lines 1-9.

At the *White* trial Johnson made it clear that Corbett was a participant in the discussions on the porch in Baltimore about the robbery and murder for hire:

**A.**    Yeah, yes. Basehead came around. He drove down. He had another guy with him I didn't know at the time. I believe I was sitting across the street on the porch just outside. He came on the porch, started talking to Teddy and Jerk and all them. And at some point, I don't know if I was called over or if I walked over, I just walked over there on the porch, you know, to speak. And he was saying something about a lick up in Hagerstown, a robbery and all this stuff, 20,000 dollars, you know. I guess he was going into details, but I was pretty much sold on it at that point, you know.

**Q**.    And this is being discussed by Rell or Basehead?

**A.**    Between him and the guy he was with.

**Q.**    The guy he was with, you've never seen him before?

**A.**    No.

**Q.**    Didn't know his name?

**A.**    No.

**Q.**    But the two of them are discussing it with everybody on the porch?

**A**.    Yes.

**Q.**    And was it discussed that, in addition to being a lick, that it was going to be a killing as well?

MR. MARTINO: Objection, leading.

16

THE COURT: Overruled.
THE WITNESS: At some point, yes.
BY MR. BEHE:
**Q**.    On that porch?
**A**.    Yes.

*U.S. v. White*, N.T. pp. 16-17.

The "other person" with Adgebesan was the defendant. Adgebesan confirmed this, and the defendant's involvement in the murder for hire scheme, at his change of plea proceeding when he agreed with the government's statement of facts. Doc. 1402.

Missing from any of the defendant's statements is any reference specifically to co-defendant Torey White. In his sentencing memorandum Corbett references unspecified "Hagerstown drug dealers he knew who organized the robbery" to include Kevin Coles and Devin Dickerson. No mention though of White. It is the United States' belief that this omission is purposeful. If Corbett were honest about his involvement he would have to acknowledge White's involvement as well. White was in Buck's kitchen that evening and assured everyone "the bitch would be there", referring to Chaney being at the Jackson property. Corbett's explanation: he was in another room and did not hear what was being discussed in Buck's kitchen. More to the point that the omission of any mention of

White is purposeful is the testimony that White met with Corbett at the Country Store at Cearfoss Circle, MD before meeting with the killers and proceeding to the Jackson property. Angela Barney testified at the *White* trial in May 2023 that she was in the car with Corbett driving to the Jackson property that night in tandem with Johnson and the crew from Baltimore who were following in Johnson's van, and also followed by Adgebesan driving separately in his car. Barney testified that Corbett directed her to pull into the Country Store parking lot because Corbett had to meet someone who would be driving a pickup truck with a 4-wheeler in the bed. That meeting occurred, and after the meeting Corbett and Barney regrouped with Johnson and the others and proceeded to the Jackson property. That pick-up truck with the 4-wheeler in the bed was Phil Jackson's, and it was being operated that evening by Torey White. The import from this meeting is that White conveyed to Corbett that Chaney was on her way to the Jackson property and that the group could now advance to the farm to kill Chaney and rob Phil Jackson. And, again, this constitutes evidence that Corbett has not fully and truthfully admitted his involvement because if he did he would have to implicate White and other unspecified "Hagerstown drug dealers" as well as

acknowledging his own knowing, pivotal role in the murder for hire undertaking. Corbett's description of his role as "meaningful" is much too modest and clearly inaccurate.

This "robbery gone bad" description was pushed by Chris Johnson until he eventually acknowledged it was a murder for hire plot. Adgebesan likewise denied involvement but admitted this was a murder for hire. Coles and White were convicted by separate juries which also confirmed this to be a murder for hire. This court rejected co-defendant Nicholas Preddy's claim that he was not involved in the triple murders or even present for them and credited the testimony of Christopher Johnson and Michael Buck that Preddy was involved and present at the scene. The court imposed the 30 year maximum sentence for the offense of participating in an attempt to kidnap and kill Adgebesan out of fear he was cooperating with federal authorities, departing well above the applicable guidelines based on conduct that was dismissed under the plea agreement, i.e., involvement in the triple murders, and based upon U.S.S.G. §§ 5K2.1 and 5K2.23. The statement of reasons form appears to be incorrect and the form should have § 5K2.21 checked instead of 5K2.23. See Doc. 1725, p. 2.

So it should be here as well. Corbett's self-serving description of his involvement, omitting any pre-knowledge of the murder for hire, should likewise be rejected.

It may be helpful to the court to compare the penalty Corbett would face if he was prosecuted for similar conduct under different federal statutes as well as in the Commonwealth of Pennsylvania where these murders were committed. Under federal law, the murders of Wendy Chaney, Phillip Jackson and Brandon Cole were willful, deliberate and premeditated, and they were committed during the perpetration of a felony, i.e., Hobbs Act robbery. Under either theory the crimes constitute first degree murder federally, if so charged, and punishable by either death or a mandatory term of life imprisonment. *See* 18 U.S.C. § 1111(a) and (b).

Likewise, in the Commonwealth of Pennsylvania, a willful, deliberate, and premeditated killing is first degree murder and punishable by either death or a mandatory term of life imprisonment. However, felony murder in Pennsylvania is designated second degree murder. Regardless of its separate designation from the definition of first degree murder, a defendant convicted of second degree murder in

Pennsylvania is also subject to a mandatory life sentence as either a principal or an accomplice. Second degree murder in Pennsylvania is not a death penalty offense.

Therefore, had Corbett been convicted in either federal court or a Court of Common Pleas in Pennsylvania for being a participant in a felony murder he would be sentenced to life imprisonment.  So here, even if the court accepts Corbett's claim that he did not know part of the episode that evening was to kill a DEA cooperator, Corbett was fully aware, and it was reasonably foreseeable, that there was the possibility of death during the commission of the Hobbs Act robbery by the armed individuals from Baltimore. Corbett acknowledges as much when he says he was a participant "in a multi-victim felony murder based upon the underlying drug house robbery," Doc. 1755, p. 11, involving "persons willing to use violence", Doc. 1755, p. 3, in a "high-risk"… "potentially dangerous robbery". Doc. 1755, p. 3.

**B.    An Upward Variance from the Guidelines and/or an Upward Departure is Warranted under the 3553(a) Factors and U.S.S.G. §5K2.0.**

Paragraph 19 of Corbett's plea agreement contains broad, inclusive language regarding what the court can consider at sentencing and what the United States can ask the court to consider:

At sentencing, the United States will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information about the defendant's background, character, and conduct, *including the conduct that is the subject of the charges that the United States has agreed to dismiss.* (emphasis added).

Furthermore, paragraph 13 of the plea agreement provides as follows:

At the time of sentencing, the United States may make a recommendation that it considers appropriate based upon the nature and circumstances of the case and the defendant's participation in the offense, and specifically reserves the right to recommend a sentence up to and including the maximum sentence of imprisonment and fine allowable, together with the cost of prosecution.

Unlike at trial, proof beyond a reasonable doubt has no application at sentencing when there are issues in dispute. Rather, the lesser preponderance of the evidence standard applies. *See United States v. Watts*, 519 U.S. 148, 154 (1997); USSG §6A1.3 Resolution of Disputed Factors (Policy Statement). Any information may be considered, so long as it has sufficient indicia of reliability to support its probably accuracy.

*Watts*, 519 U.S. at 157; 18 U.S.C. §3661. The information referenced in this sentencing memorandum is reliable in that it comes from sworn trial testimony of co-defendants and the overall facts of the investigation that has been presented to the court over the past few years.

Here the sentencing guidelines for Hobbs Act robbery call for a sentence of 30-years to life imprisonment, but since the statutory maximum sentence is 20 years, the guidelines is 240 months. There is no such statutory maximum limit affecting the guidelines for the 924(c) conviction. The suggested guidelines is the 10 year mandatory minimum sentence, but since the offense maximum is life imprisonment, the guidelines are not fettered as with Hobbs Act robbery.

In addition to a variance pursuant to the 3553(a) factors, the United States respectfully requests an upward departure under Policy Statements at USSG §§5K2.1 Death, 5K2.4 Unlawful Restraint, and 5K2.21 Dismissed and Uncharged Conduct, to address the triple murders and the defendant's participation in same. Pursuant to § 5K2.1, an upward departure may be warranted in the following circumstances:

If death resulted, the court may increase the sentence above the authorized guideline range. Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among

levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of personal injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

As admitted by Christopher Johnson and Jerell Adgebesan at their change of plea proceedings, this was a contract killing. The death of Wendy Chaney was intended, and the killings of Phillip Jackson and Brandon Cole were likewise intentional as the circumstances of the grizzly crimes dictated witnesses needed to be murdered, all warranting an upward departure under §5K2.1. There were multiple murder victims, bound with zip ties, set on fire, and executed. That likewise justifies the requested upward departure under §5K2.1. Furthermore, as the victims were unlawfully restrained to facilitate commission of the crimes § 5K2.4 applies. Finally, under § 5K2.21, the court can consider the dismissed murder charges and depart upward to reflect the actual seriousness of the offense. Simply calculating the Hobbs Act guidelines by using the 2A1.1(a) cross-reference does not account for the fact that this was a

24

murder for hire of a DEA cooperator and two other potential federal witnesses.

These were a horrific crimes, and the murder of Chaney in particular, a DEA cooperator and potential witness, was an assault on the foundation of the system of justice. Her murder was retribution for her cooperation with law enforcement and to prevent her further cooperation. Even if the court accepts Corbett's lack of knowledge argument, this was still a multi-victim felony murder warranting an upward departure.

There is no legal impediment to the court considering the triple murders when determining the appropriate sentence. Indeed, the guidelines explicitly direct the court to consider such relevant, uncharged criminal conduct. See U.S.S.G. §1.B1.3 (Relevant Conduct). And the fact that the defendant pled guilty to a charge that did not require admission to the murder for hire of Wendy Chaney is not a concession by the United States that the defendant was not fully aware beforehand that this was a murder for hire. Therefore, those dismissed counts of the Third Superseding Indictment should be considered by the court when imposing sentence

All things considered, a sentence of life imprisonment for this defendant for this conduct is sufficient but not greater than necessary to comply the with sentencing purposes set forth in 18 U.S.C. §3553(a).

## II.   CONCLUSION

WHEREFORE, it is respectfully requested that the court deny the defendant's request to be sentenced to a term of years and instead sentence the defendant to a term of life imprisonment for the 924(c) conviction, to run consecutively to whatever sentence the court imposes for the Hobbs Act robbery conviction.

Respectfully submitted,

GERARD M. KARAM
United States Attorney

Dated:  June 28, 2023

s/William A. Behe
WILLIAM A. BEHE
Assistant U.S. Attorney
PA-32284
1501 North 6th Street, Box 202
Harrisburg, PA 17102
717/221-4482 (Office)
william.behe@usdoj.gov

s/Michael A. Consiglio
MICHAEL A. CONSIGLIO
Assistant U.S. Attorney

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIM. NO. 1:16-CR-212** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KENYATTA CORBETT** | : | **(Electronically Filed)** |
| **Defendant** | : | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers, and that on this 28th day of June 2023, she served a copy of the attached

### GOVERNMENT'S SENTENCING MEMORANDUM

by electronic case filing to the persons hereinafter named:

Christopher Ferro, Esquire
chris@ferrolawfirm.com

Edward J. Ungvarsky, Esquire
ed@ungvarskylaw.com

/s/ *Ashley Lubold*
Ashley Lubold
Legal Assistant